

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., | § | No. 08-16-00069-CV |
| Appellant, | § | Appeal from the |
| v. | § | 98th Judicial District Court |
| TEXAS COMMISSION ON ENVIRONMENTAL QUALITY & RICHARD A. HYDE, Executive Director of TCEQ, | § | of Tavis County, Texas |
| | § | (TC# D-1-GN-14-004531) |
| | § | |
| Appellees. | | |

## DISSENTING OPINION

By affirming the denial of a partial tax exemption despite Appellant showing it is using its property, in part for pollution control and in part for electricity production, the Court today broadly expands the discretionary authority of the Executive Director of the Texas Commission on Environmental Quality (the "TCEQ"). The denial of a partial use determination—for property recognized by the Texas Legislature as meeting pollution control standards—contradicts the text of Section 11.31 of the Texas Tax Code, and controlling precedents interpreting said text. Therefore, I respectfully dissent.

Pursuant to its docket equalization authority, the Texas Supreme Court transferred this appeal from our sister court in Austin, Texas; we must therefore decide this case in accordance

with any precedent of that court. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2013)(authorizing transfer of cases); TEX.R.APP.P. 41.3 (precedent in transferred cases). This Court's decision is reached a few short weeks after a recent decision by the Austin Court of Appeals—the court from which this case was transferred—that concerns Heat Recovery Steam Generators ("HRSGs"), or the same pollution control property at issue here. *See Freestone Power Generation, LLC v. Texas Comm'n on Envtl. Quality*, No. 03-16-00692-CV, 2017 WL 3044547, at *1 (Tex.App.--Austin July 11, 2017, no pet.h.)(mem. op.). As in *Freestone*, the issue here is one of statutory interpretation: whether the text of Section 11.31 of the Tax Code provides that the TCEQ has the authority or discretion to issue negative use determinations for items the Legislature has already identified as having positive use functions when used, in part, for pollution control. *See* TEX.TAX CODE ANN. § 11.31 (West 2015). Like the *Freestone* court, I find that the plain text of the statute unambiguously restricts the Executive Director of the TCEQ from doing so.

## Statutory Framework

Before turning to the more pertinent subsections of the tax provision at issue, it is helpful to begin with a layout of the statutory and regulatory framework. Pursuant to a voter-approved constitutional amendment,[1] the Legislature enacted Section 11.31 of the Tax Code, titled "Pollution Control Property," to provide a taxation exemption for "property that a person owns and that is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution." *See* Act of May 10, 1993, 73d Leg., R.S., ch. 285, §§ 1, 5, 1993 TEX.GEN.LAWS 1322, 1322–24 (codified as amended at TEX.TAX CODE ANN. § 11.31).

§ 11.31(a) & (b)

---

[1] TEX. CONST. art. VIII, § 1–*1* (adopted at the Nov. 2, 1993 election (*see* Tex. H.J.R. Res. 86, §§ 1–2, 73rd Leg., R.S., 1993 TEX.GEN.LAWS 5576, 5576–77)).

Under Subsection 11.31(a) of the Tax Code, "[a] person is entitled to an exemption from taxation of all or part of real and personal property that the person owns and that is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution." TEX.TAX CODE ANN. § 11.31(a). Subsection (b) defines a "facility, device, or method for the control of air, water, or land pollution" as:

> [L]and that is acquired after January 1, 1994, or any structure, building, installation, excavation, machinery, equipment, or device, and any attachment or addition to or reconstruction, replacement, or improvement of that property, that is used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency of the United States, this state, or a political subdivision of this state for the prevention, monitoring, control, or reduction of air, water, or land pollution.

*Id.* at § 11.31(b).[2] To qualify for this exemption, the property must not only have a pollution control function ("any . . . device . . . that is used . . . for the prevention, monitoring, control, or reduction of air, water, or land pollution"), the property must also be adopted for a regulatory compliance purpose ("any . . . device . . . that is used . . . to meet or exceed rules or regulations adopted by any environmental protection agency"). *Id.* In short, property that meets the statutory definition and qualifies for the exemption is termed "pollution control property." *See id.* at § 11.31(c), (f), (h), (i).

## § 11.31(c) & (d)

The Legislature established a process for administering the exemption. Under Subsection (c), exemption applicants

> [S]hall present in a permit application or permit exemption request to the executive director of the Texas Commission on Environmental Quality [TCEQ] information detailing:
>
> (1) the anticipated environmental benefits from the installation of the facility,

---

[2] Subsection (b) excludes motor vehicles. TEX.TAX CODE ANN. § 11.31(b).

3

device, or method for the control of air, water, or land pollution [the environmental benefits or (c)(1) information];

(2) the estimated cost of the pollution control facility, device, or method [the cost or (c)(2) information]; and

(3) the purpose of the installation of such facility, device, or method, and the proportion of the installation that is pollution control property [the purpose and proportion or (c)(3) information].

TEX.TAX CODE ANN. § 11.31(c)(1)-(3). The subsection further requires an applicant to provide information as the executive director requires, "[i]f the installation includes property that is not used wholly for the control of air, water, or land pollution . . . for the determination of the proportion of the installation that is pollution control property." *Id*.

TCEQ's initial response is described in Subsection (d). "Following submission of the [application], the executive director of the [TCEQ] shall determine if the facility, device, or method is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution." *Id*. at TEX.TAX CODE ANN. § 11.31(d). During this first stage of the application process, an applicant receives what the TCEQ describes as a "use determination." *See id*. at § 11.31(a)-(d); *see also* 30 TEX.ADMIN.CODE § 17.2(11)(West 2017)(defining "use determination" as a "finding, either positive or negative, by the executive director that the property is used wholly or partially for pollution control purposes and listing the percentage of the property that is determined to be used for pollution control"). That is, a use determination is a finding that recognizes that the applied for property is pollution control property eligible for the exemption, in whole or part. *See id*. at § 11.31(c), (d). Subsection (d) additionally requires that the executive director "issue a letter to the [applicant] stating the executive director's determination of whether the facility, device, or method is used wholly or partly to control pollution and, if applicable, the proportion of the property that is pollution control property." *Id*. It further requires that the

4

executive director notify the local appraisal district in the county where the property is located. *Id*.

§ 11.31(e) & (i)

The Legislature established a process whereby the applicant, or the appraisal district, may appeal the executive director's use determination. *See id.* at § 11.31(e). The use determination may be appealed to the TCEQ commissioners, which must consider the appeal at their next regularly scheduled meeting and either affirm the use determination or remand it for re-determination. *See id.* The subsection establishes that an appeal "is not a contested case" for purposes of the Administrative Procedure Act (APA). *See id.*; *see also* TEX.GOV'T CODE ANN. §§ 2001.001–.902 (West 2016). The TCEQ's order in such a proceeding may be challenged through a suit for judicial review in district court in Travis County, *see* TEX.WATER CODE ANN. §§ 5.351, .354 (West 2008), and the district court's judgment is "appealable as are other civil cases in which the district court has original jurisdiction," *id.* at § 5.355. Once an applicant obtains a determination that the property is wholly or partly pollution control property, what is referred to as a final "positive use determination," the applicant can then apply for the tax exemption with the local appraisal district where the property is located. *See* TEX.TAX CODE ANN. § 11.31(i); *see also* TEX.TAX CODE ANN. § 11.43(West Supp. 2016)(setting forth application requirements). The chief appraiser must accept the executive director's positive use determination as "conclusive evidence" that the property (or, if applicable, the proportion of the property that the executive found to be pollution control property) qualifies for the exemption. *See id.* at § 11.31(i); *see also* 30 TEX.ADMIN.CODE § 17.2(11).

*2002 Rule Amendments*

§ 11.31(g) & (h)

In 2001, the Legislature again amended Section 11.31 to clarify and require that the

executive director establish standards when deciding Section 11.31 applications. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 881, § 1, 2001 TEX.GEN.LAWS 1774, 1775 (codified at TEX.TAX CODE ANN. § 11.31(g)). The Legislature mandated that the rules the TCEQ adopts to implement Section 11.31 comply with Section 11.31 generally, and with two specific subsections. *See generally* TEX.TAX CODE ANN. § 11.31(g), (k). Under Subsection (g), the "[r]ules adopted under [Section 11.31] must:

(1) establish specific standards for considering applications for determinations;

(2) be sufficiently specific to ensure that determinations are equal and uniform; and

(3) allow for determinations that distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution from the proportion of property that is used to produce goods or services."

TEX.TAX CODE ANN. § 11.31(g). The amendments prohibited the executive director from granting a positive use determination "unless the property [met] the standards established under rules adopted under this section." *Id.* (codified at TEX.TAX CODE ANN. § 11.31(h)).

To implement the then-newly enacted statutory provisions, the TCEQ amended its rules to require specific and uniform procedures for applications with property having pollution control and production functions. *See* 26 TEX.REG. 7420 (2001), *adopted* 27 TEX.REG. 185–91 (2002) (codified at 30 TEX.ADMIN.CODE §§ 17.1–.25)("2002 Rules"). The 2002 Rules prescribed that "[t]o obtain a positive use determination," the applied for property needed to satisfy the statutory definition of pollution control property, and required that the executive director determine the portion of the property eligible for a "positive use determination" only if the property satisfied the "requirements of § 17.15 and § 17.17 of this title (relating to Review Standards and Partial Determination)." *See* 2002 Rules § 17.4(d). Section 17.15, titled "Decision Flow Chart," required that applicants use a flow chart which ultimately provided for three types of eligible property: Tier

6

I, Tier II, and Tier III. *See id*. at § 17.15.



As shown in the Decision Flow Chart, the executive director prepared a list of property that "is

considered to be pollution control property." *See id*. (flow chart & n.1).[3]  After receiving an

application, the executive director first considered whether the installation of the property or

process in question allowed the applicant to meet or exceed a specific, identifiable environmental

law or regulation. *See id.* (flow chart & n. 3).  If so, the executive director next considered whether

the property or process provided an identifiable environmental benefit "at the site where it [was]

installed." *See id.* (flow chart & n. 4).  If the answer was again in the affirmative, the property was

considered "eligible" for a positive use determination. *See id.*  After determining that the property

---

[3] The flow chart is available at http://texreg.sos.state.tx.us/fidsreg/200105487-1.html.

was "eligible," the inquiry changed to determine the portion of the property that was pollution control property.

To determine the proportion of the property that was pollution control property, the Decision Flow Chart established three categories:

1. Tier I applications for property that the TCEQ had predetermined was partially or wholly pollution control property and listed on the "Predetermined Equipment List (PEL)." *See id*. at § 17.2(9), (11).

2. Tier II applications for property used wholly for pollution control purposes but not on the PEL. *See id*. at § 17.2(12).

3. Tier III applications for property not used wholly for pollution control, not on the PEL, and thus "evaluated as a partial determination." *See id*. at § 17.2(7), (13).

*See id*. at § 17.15 (flow chart & n.5-7). Section 17.17 governed Tier III determinations, also termed "partial determinations." *See* 2002 Rules § 17.35(7), .17.

Items on the PEL were published as an "appendix" to a "Technical Guidelines Manual" that the TCEQ provided to guide applicants. *See* 19 TEX.REG. 7793, 7794–96 (Sept. 30, 1994) (explaining that the PEL would be kept separate as an appendix of the manual because of the need to continually revise the PEL "independent of the manual"). Tier III applications were required to include a cost-analysis procedure (or "CAP") calculation to show what portion of the property the applicant estimated was attributable to pollution control. *See id.* at § 17.17(b); *see also id.* at § 17.2(4)(defining "cost analysis procedure").

> Simply described, the calculations sought to identify the percentage of the property's total capital costs that were attributable to the property's pollution-control feature by (1) comparing the total capital costs to the cost of comparable equipment without the pollution-control feature, and (2) adjusting downward for (a) any increases in productive capacity attributable to the new property and (b) the value of any waste byproducts that could be reused or recycled due to the new pollution-control feature. *See id.* § 17.17 (referenced charts located at 27 Tex. Reg. at 305–06); *see also id.* § 17.2(1), (2), (3), (10) (defining 'byproduct,' 'capital cost new,' 'capital cost old,' and 'production capacity factor' respectively).

8

*Mont Belvieu Caverns, LLC v. Texas Com'n on Envtl. Quality*, 382 S.W.3d 472, 479 (Tex.App.--Austin 2012, no pet.). An applicant could file a Tier I application for a determination based on the PEL, or a Tier II application seeking to demonstrate that the property was wholly (100 percent) pollution control property, and would otherwise be required to file a Tier III application seeking a partial use determination. *See* 2002 Rules § 17.2(11)-(13), § 17.17(a). The 2002 Rules likewise imposed filing fees corresponding to the relative complexity and resource-intensiveness of the work the application demanded of the TCEQ's staff, with Tier I applications requiring the lowest application fee, Tier III requiring the highest fee, and Tier II a fee in between. *See id.* at § 17.20(a).

*2008 Rule Amendments*

§ 11.31(k), (*l*), & (m)

The Legislature again amended Section 11.31 in 2007, enacting a new subsection which mandated that the TCEQ "adopt rules establishing a nonexclusive list of [pollution control property][4] which must include . . . (8) heat recovery steam generators," or HRSGs, in addition to sixteen other named items, and one catchall category[5] meeting certain criteria (the "k-list"). *See* Act of May 28, 2007, 80th Leg., R.S., ch. 1277, § 4, 2007 TEX.GEN.LAWS 4261, 4264 (codified at TEX.TAX CODE ANN. § 11.31(k), (*l*), (m)). Subsection (*l*) directed the TCEQ to update the k-List "by rule" at least once every three years. TEX.TAX CODE ANN. § 11.31(*l*). The Legislature did not grant the TCEQ unfettered authority to eliminate items from the k-list, but rather, the TCEQ may

---

[4] Subsection (k) states "facilities, devices, or methods for the control of air, water, or land pollution" rather than the bracketed language, *see* TEX.TAX CODE ANN. § 11.31(k), however, as explained above, Subsections (a) and (b) provide a statutory definition for "facilit[ies], device[s], or method[s] for the control of air, water, or land pollution." *See* TEX.TAX CODE ANN. § 11.31(a)-(b).

[5] The catch all category includes "any other equipment designed to prevent, capture, abate, or monitor nitrogen oxides, volatile organic compounds, particulate matter, mercury, carbon monoxide, or any criterial pollutant." *See* TEX.TAX CODE ANN. § 11.31(k)(18)

only remove an item from the k-list if it "finds compelling evidence to support the conclusion that the item does not provide pollution control benefits." *Id.*[6] In addition, the Legislature enacted Subsection (m), discussed further below, which, in part, forms the basis of the parties' dispute here.

The TCEQ responded by promulgating rule amendments. *See* 32 TEX.REG. 6985 (2007), *adopted by* 33 TEX. REG. 932 (2008)(codified at 30 TEX.ADMIN.CODE §§ 17.1–.20 (2008))("2008 Rules"). The 2008 Rules replaced the former PEL with "Part A" of a new and slightly different "Equipment and Categories List" (ECL), incorporated into the rules. *See* 2008 Rules §§ 17.2(7) (defining "Equipment and Categories List"), 17.14 (describing "Equipment Categories List"). "Part B" of the ECL consisted of certain categories of pollution control property and processes that the Legislature's 2007 amendments required the TCEQ to include: the k-list. *See* TEX.TAX CODE ANN. § 11.31(k); 2008 Rules § 17.14(a). Applicants with k-list property could propose their own methodology for calculating a use percentage other than CAP, establishing a new category of applications—"Tier IV" applications—provided that the executive director would make the final determination. *See id.* at § 17.17(d). Under the 2008 Rules, if the CAP method or the method accepted by the executive director under Subsection (d) produced a negative number or a zero, the property was not eligible for a positive use determination. *Id.* at §§ 17.2(9), (17), 17.17(e).

*2010 Rule Amendments*

§ 11.31 (g-1)

In 2009, the Legislature again amended Section 11.31. *See* Act of May 25, 2009, 81st Leg., R.S., ch. 962, §§ 3, 5–6, 2009 TEX.GEN.LAWS 2556, 2557–58 (codified at TEX.TAX CODE ANN.

---

[6] The record here does not contain any evidence the TCEQ has proposed such a finding for HRSGs, despite the fact that several review periods have passed during the pendency of this controversy.

§ 11.31(g-1)). The new subsection required that the TCEQ "uniformly" apply the same "standards and methods" when making use determinations, regardless of whether the property is on the k-list. *Id*. Subsection (g-1) did not apply to applications before January 1, 2009, which remained subject to the 2008 Rules. *Id*. at 2558.[7]

In response, the TCEQ again amended its rules. *See* 35 TEX.REG. 6255 (2010), *adopted* 35 TEX.REG. 10964 (2010)(codified at 30 TEX.ADMIN.CODE §§ 17.2–17.25)("2010 Rules"). The 2010 Rules eliminated the availability of Tier IV applications and required applicants with k-list property to use the CAP method for calculating the pollution control use percentage. *See* 2010 Rules § 17.17(a), (c).

## Factual and Procedural Background

In April 2009, Brazos Electric Power Cooperative, Inc. ("Brazos Electric") applied for a pollution control property tax exemption for its HRSG in use in its Johnson County facility. In September 2009, the TCEQ informed Brazos Electric that this application was subject to the then-newly enacted Subsection (g-1) of Section 11.31. In March 2012, Brazos Electric submitted its revised application for its Johnson County facility and thereafter submitted a separate application for another HRSG in use at its Jack County facility. Both of Brazos' applications contained calculations that resulted in positive use determinations.[8]

In July 2012, the executive director responded by rejecting both applications and issued a negative use determination stating: "[HRSGs] and associated dedicated ancillary equipment are used solely for production; therefore, are not eligible for a positive use determination." Brazos

---

[7] Discussed further below, this was a factual distinction from the issue in the recent decision from the Austin Court of Appeals. *See Freestone Power Generation, LLC v. Texas Comm'n on Envtl. Quality*, No. 03-16-00692-CV, 2017 WL 3044547, at *1 (Tex.App.--Austin July 11, 2017, no pet.h.)(mem. op.).

[8] Based on its calculations, Brazos Electric requested a positive-use determination of 64.29 percent for the Johnson County facility and 74.66 percent for the Jack County facility.

11

Electric appealed both determinations, and the TCEQ commissioners reversed the executive director's determinations (in addition to several other HRSG negative use applicants), vacated the determination orders, and remanded the applications for a re-determination.

On remand, the executive director issued two notices of deficiencies requesting that Brazos Electric update its applications calculating a creditable percentage of pollution control using the CAP formula method with the TCEQ's specified inputs. Brazos Electric objected to the inputs specified by the executive director and resubmitted an altered Johnson County facility application which still resulted in a positive use determination. It additionally proposed four alternative methods, two of which did not apply the CAP formula, for a use determination. The executive director again rejected the applications, including each of the alternative methods, and independently issued negative use determinations based on inputs it selected for both of Brazos Electric's HRSG applications.[9] Brazos Electric appealed these negative use determinations to the TCEQ commissioners, who affirmed the negative use determinations. Brazos Electric filed a petition for judicial review, and the trial court affirmed the TCEQ's orders.[10] This appeal followed.

## DISCUSSION

In their first issue on appeal, Brazos Electric challenges the TCEQ's order affirming the executive director's negative use determinations for their HRSGs. Brazos Electric contends that the TCEQ does not have the authority or discretion to deny a positive use determination for its HRSGs under Section 11.31 and therefore exceeded its statutory authority. Brazos Electric points to the language of Section 11.31 to argue that the statutory language unambiguously establishes

---

[9] As the majority opinion explains, applying CAP methodology with disputed inputs, the executive director calculated negative percentages for both the Johnson County facility (-82.55%) and the Jack County facility (-277.50%). Based on these scores, the executive director denied tax exemptions for both applications.

[10] Brazos Electric sought judicial review under TEX. WATER CODE Ann. § 5.351 (West 2008), seeking declaratory relief in Travis County District Court.

that HRSGs are pollution control property entitled to positive use determinations and that the TCEQ's discretion in making use determinations for k-list property is limited to distinguishing the proportion of the property used for pollution control from the proportion used for production. For the reasons explained below, I agree.

**Standard of Review**

The parties disagree on the contours of the standard of review applicable to the first issue in this case. The TCEQ contends in its brief, citing *City of El Paso v. Pub. Util. Com'n of Texas*, that the Texas Supreme Court has "equated the abuse-of-discretion standard and the arbitrary-and-capricious standard" when the Court stated: "An agency's decision is arbitrary or results from an abuse of discretion if the agency: (1) failed to consider a factor the legislature directs it to consider; (2) considers an irrelevant factor; or (3) weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result." 883 S.W.2d 179, 184 (Tex. 1994) (citing *Gerst v. Nixon*, 411 S.W.2d 350, 360 n.8 (Tex. 1966)). The TCEQ cites an additional statement where the Court stated: "When properly attacked, an arbitrary action cannot stand and the test generally applied by the courts in determining the issue of arbitrariness is whether or not the administrative order is reasonably supported by substantial evidence." [Citations omitted]. *Gerst*, 411 S.W.2d at 354. I disagree with the TCEQ's approach to the extent that it only adopts an abuse of discretion or arbitrary-or-capricious standard in reviewing the issue at hand without considering statutory restrictions. As the majority recognizes, the issue in this case requires this Court to begin by construing Section 11.31 of the Tax Code, which calls for a *de novo* review. *Mont Belvieu Caverns, LLC*, 382 S.W.3d at 486 (citing *State v. Shumake,* 199 S.W.3d 279, 284 (Tex. 2006)).

Courts begin with a statute's text because it is the best indication of the Legislature's intent.

13

*Fresh Coat, Inc. v. K–2, Inc.,* 318 S.W.3d 893, 901 (Tex. 2010)("Our ultimate purpose when construing statutes is to discover the Legislature's intent. Presuming that lawmakers intended what they enacted, we begin with the statute's text, relying whenever possible on the plain meaning of the words chosen.") [Citations and quotations omitted]. Courts seek to give effect to the Legislature's language, beginning with the statute's plain meaning, "which [is] derive[d] 'from the entire act and not just from isolated portions.'" *Mid-Century Ins. Co. of Texas v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007)(quoting *State ex rel. State Dep't of Highways and Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002)). "Thus, we 'read the statute as a whole and interpret it to give effect to every part.'" *Id*. (quoting *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998)). "When statutory text is clear, it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would produce an absurd result." *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 49 (Tex.App.--Austin 2013, no pet.)(citing *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009)). Moreover, the Code Construction Act specifies that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." TEX.GOV'T CODE ANN. § 311.011(a)(West 2013)(quoted in *Thompson v. Texas Dep't of Licensing & Regulation*, 455 S.W.3d 569, 571 (Tex. 2014)). "It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inopertive." *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex. 2003)(citing *Spence v. Fenchler*, 107 Tex. 443, 456, 180 S.W. 597, 601 (1915); *see also* TEX. GOV'T CODE ANN. § 311.021(2)(West 2013). That is, "every word in a statute is presumed to have been used for a purpose; and a cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible." *Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.* 35 S.W.3d 591, 593 (Tex. 2000).

14

When considering a tax exemption statute, the Texas Supreme Court previously stated that courts "should not disregard the economic realities underlying the transactions in issue." *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013). In making that observation, however, the Texas Supreme Court subsequently explained that it was not suggesting "that, in the guise of considering the economic realities or essence of the transaction, courts were authorized to impose an entirely new requirement . . ." not found in the language of the tax statute. *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 627 n.8 (Tex. 2013). Courts must take the Legislature "at its word and giv[e] the statute its plain meaning," turning to "rules of construction such as agency deference and strict construction . . . only when a statute is ambiguous." *Id.* at 627; *Titan Transp., LP v. Combs*, 433 S.W.3d 625, 636 (Tex.App.--Austin 2014, pet. denied)(citing *Roark Amusement*, 422 S.W.3d at 635 (explaining that courts defer to agency interpretation of ambiguous statutes unless plainly erroneous or inconsistent with statutory language)).

An agency's interpretation of a statute it administers is entitled to serious consideration, so long as it is reasonable and does not conflict with the statute's language. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008); *State v. Pub. Util. Com'n of Texas*, 344 S.W.3d 349, 356 (Tex. 2011). A statute providing an agency with express power "may also have implied powers necessary to accomplish the express duties that the Legislature gives to it." *Cities of Austin, Dallas, Ft. Worth & Hereford v. Sw. Bell Tel. Co.*, 92 S.W.3d 434, 441 (Tex. 2002). Still, an agency "may not exercise what is effectively a new power, or a power contrary to a statute . . ." even if the power is expedient for administrative purposes. *Id.*; *Pub. Util. Com'n of Texas*, 344 S.W.3d at 356. With these principles in mind, I turn to Section 11.31 of the Tax Code.

§ 11.31 (a) & (b)

Read together, Subsection (a) and (b) of Section 11.31 prescribe that "[a] person is entitled

15

to an exemption from taxation of all or part of real and personal property" owned and used, wholly or partly, as *statutorily defined* pollution control property. *See* TEX.TAX CODE ANN. § 11.31(a)-(b). The Legislature's use of the language "*is* entitled to," rather than "*may be* entitled to," confirms that the Legislature intended a tax exemption for pollution control property to be a matter of right when the property satisfies the statutory definition and qualifies for the exemption. *See* TEX.GOV'T CODE ANN. § 311.016(1)(West 2013)("'[m]ay' creates discretionary authority or grants permission or a power"), (4)("'[i]s entitled to' creates or recognizes a right"). Property satisfies the statutory definition if it satisfies Subsection (b). *See* TEX.TAX CODE ANN. § 11.31(b). Property qualifies for the exemption under Subsection (a) when "property that the person owns and that is used wholly or partly as [property that satisfies Subsection (b)]," or pollution control property. *See* TEX.TAX CODE ANN. § 11.31(a), (b). In addition, the Legislature's use of the language "wholly or partly" demonstrates that the Legislature intended the exemption to apply not only to property that is used "wholly" as control pollution property, but also, to property that is used "partly" as pollution control property. The terms "wholly or partly" in Section 11.31 have been construed by the Texas Attorney General as follows:

> The term 'wholly' clearly refers to property that is used only for pollution control, such as an add-on device. *See* Merriam Webster's Collegiate Dictionary 1351 (10th ed. 1993)(defining 'wholly' to mean 'to the full or entire extent: . . . to the exclusion of other things'). The term 'partly,' however, embraces property that has only some pollution-control use. *See id*. at 848 (defining 'partly' to mean 'in some measure or degree'). This broad formulation clearly embraces more than just add-on devices. Furthermore, that statute clearly embraces not only 'facilities' and 'devices' but also 'methods' that prevent, monitor, control, or reduce pollution. 'Methods' is an extremely broad term that clearly embraces means of production designed, at least in part, to reduce pollution. *See id*. at 732 (defining 'method' to include 'a way, technique, or process of or for doing something').

Tex.Atty.Gen.Op. No. JC–0372, at 5 (2001). Thus, unlike the majority's interpretation, "wholly or partly" does not include zero or negative values, rather, "wholly or partly" means "all or some."

*Id*.; *see also* BLACK'S LAW DICTIONARY 1293 (10th Ed. 2014)(defining "partial" as "[n]ot complete; of, relating to, or involving only a part rather than the whole"). I find additional support for this interpretation in a decision from the Austin Court of Appeals where the court, relying on the construction from the Texas Attorney General, explained that "'property that serves both a production and a pollution-reduction purpose [ ] is not entitled to a tax exemption on the total value of the property' *but only a partial exemption corresponding to the* 'portion of property that actually controls pollution.'" [Emphasis added]. *Mont Belvieu*, 382 S.W.3d at 478 (quoting Op.Tex.Att'y Gen. No. JC-0372 at 6-7).

§ 11.31 (c) & (d)

Subsection (c)(3) further highlights how the pollution control function of a property may only be proportionally attributable ("the proportion of the installation that is pollution control property") while also having other, non-pollution control functions. *See* TEX.TAX CODE ANN. § 11.31(c). What the subsection does not contemplate is regulatory purpose proportionality: it does not contain language suggesting that the property may have some regulatory satisfaction purpose and some non-regulatory satisfaction purpose. Under Subsection (d), the executive director has the discretion to determine—and indeed must determine—whether the applicant is using any of the property described in the application as pollution control property, as defined under Subsection (b). *See id.* at (d). The executive director must send the applicant a letter stating whether the property described in the application is pollution control property; only if a proportion of the described property is pollution control property will the letter then state which portion it considers pollution control property. *See id.* Subsection (d) mirror's Subsection (c) to the extent that they both echo the Legislature's awareness that the pollution control function of the property may only be proportionally attributable to the property ("the proportion of the property that is

17

pollution control property"). *Id.* at (d); *see also id.* at (c)(3).[11]

§ 11.31 (g), (k), & (*l*)

Subsection (g)(3), consistent with Subsection (c)(3) and (d), states that the TCEQ "shall adopt rules" that distinguish the portion of the property attributable to the pollution control function from the portion of the property attributable to the production function of the property. *See id.* at (d), (c), (g)(3). The Legislature thus again contemplated that property that has a pollution control function ("distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution") may also have a non-pollution control function, here, a production function ("from the proportion of property that is used to produce goods or services"), mandating the TCEQ to allocate the property's function proportionally for such dual-use property. *See id.* at (g)(3). While Subsection (d) generally requires the TCEQ to determine whether the property is pollution control property, even if only partially, Subsection (k) provides that "[t]he [TCEQ] shall adopt rules establishing a nonexclusive list" of pollution control property the Legislature has identified, which must include HRSGs. TEX.TAX CODE ANN. § 11.31(d), (k)(8).

"Must," like "shall," imposes a mandatory duty. TEX.GOV'T CODE ANN. § 311.016(3); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001). When the Legislature required that the adopted rules "establish specific standards for considering applications," "ensure that determinations are equal and uniform," and "allow for determinations that distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution from the proportion of property that is used to produce goods or services" in Section 11.31, the TCEQ could not adopt rules ignoring these express statutory directives. *Moers v. Harris Cnty. Appraisal Dist.*,

---

[11] In addition, and similar to Subsection (c)(3), Subsection (d) does not suggest any regulatory purpose proportionality. *See* TEX.TAX CODE ANN. § 11.31(d), (c)(3).

18

469 S.W.3d 655, 664 (Tex.App.--Houston [1st Dist.] 2015, pet. denied)(observing that an administrative agency rule is facially invalid if it contravenes specific statutory language, runs counter to the general objectives of the relevant statute, or imposes burdens, conditions, or restrictions in excess of or inconsistent with the statute)(citing *State Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 131 S.W.3d 314, 321 (Tex.App.--Austin 2004, pet. denied); *see generally*, TEX.TAX CODE ANN. § 11.31. Similarly, when the Legislature decreed that HRSGs are pollution control property under Subsection (k), in satisfaction of Section (b), it would be inconsistent with the language of Section 11.31 to find that HRSGs have no pollution control function. Thus, while I agree with the TCEQ that "[s]omeone has to determine if the property qualifies as pollution-control property," here, the Legislature has itself determined that property on the k-list—including HRSGs—are pollution control property.[12]

Reading (d) and (k) together, HRSGs fall within the definition of pollution control property and the TCEQ's discretion is limited to determining the proportion of the installation that is used as pollution control property. *Id.* at (d), (k); *Health Care Servs. Corp.*, 401 S.W.3d at 627; *Titan Transp., LP*, 433 S.W.3d at 636. Subsection (*l*) directs the TCEQ to update the k-list "by rule" every three years, giving the TCEQ the ability to remove an item from the k-list only if it presents "compelling evidence to support the conclusion that the item does not provide pollution control benefits." TEX.TAX CODE ANN. § 11.31(*l*). Thus, absent removal, the statutory language expressly requires that the TCEQ consider property on the k-list, including HRSGs, as pollution control property, requiring a positive use determination. *See id*.; *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 869 (Tex. 2009)(refusing an interpretation of an unambiguous statute

---

[12] I further disagree with the TCEQ's statement that "HRSGs *increase* the mass of pollution from the power plants." [Emphasis in orig.].

19

that would be "clearly incompatible with the purpose for such statutes").

§ 11.31(m)

Having laid this legal framework, it is necessary to turn to Subsection (m)—the basis of the parties' dispute in the present case. Subsection (m) of Section 11.31 of the Tax Code states:

> (m) Notwithstanding the other provisions of this section, *if the facility, device, or method for the control of air, water, or land pollution described in an application* for an exemption under this section *is a* facility, *device*, or method included on the list *adopted under Subsection (k)*, *the executive director* of the Texas Commission on Environmental Quality, not later than the 30th day after the date of receipt of the information required by Subsections (c)(2) and (3) and without regard to whether the information required by Subsection (c)(1) has been submitted, *shall determine that the* facility, *device*, or method *described in the application is used wholly or* partly as a *facility, device, or method for the control of air, water, or land pollution and shall take the actions that are required by Subsection (d) in the event such a determination is made.* [Emphasis added].

TEX.TAX CODE ANN. § 11.31(m).

Taking the italicized language out of (m) and inserting "pollution control property" as defined under Subsection (b) where applicable, the section reads, "if the [pollution control property] described in an application . . . is a . . . device . . . adopted under Subsection (k), the executive director . . . shall determine that the . . . device . . . described in the application is used wholly or partly as [pollution control property] and shall take the actions that are required by Subsection (d) [if] [13] such a determination is made." *Id*.

The first phrase—"if the [pollution control property]"—refers to whether the pollution control property described in the application is on the k-list. What happens if the described property is on the k-list? The executive director is then required to: first, determine that the device

---

[13] The phrase in the statute—"in the event"—means "if it happens that (something occurs)." MERRIAM-WEBSTER ONLINE DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/in%20the%20event (last visited August 29, 2017); *see also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 465 (Oxford Univ. Press, 2d ed., 1995)("[I]n the event that is unnecessary prolix for *if*.")[Emphasis in the orig.].

is used wholly or partly as pollution control property and, second, "take the actions that are required by Subsection (d)." When shall the director do this? "[N]ot later than the 30th day after the date of receipt of the information required by Subsections (c)(2) and (3) and without regard to whether the information required by Subsection (c)(1) has been submitted." *Id*.

The last phrase—"[if] such a determination is made"—does not refer, as the Court finds today, to a determination of whether the property described has a pollution control function. That determination has already been made by the Legislature. Instead, the last phrase refers to a determination of whether the property described in the application is recognized as k-listed property. *Freestone*, 2017 WL 3044547, at \*9 (citing *Hebner v. Reddy*, 498 S.W.3d 37, 42-43 (Tex. 2016)). Giving the executive director the discretion to determine that property on the k-list does not have a pollution control function advocates for an interpretation of Subsection (m) that avoids the statute's plain meaning and strips Subsection (k) of any meaning. *See Del Indus., Inc.* 35 S.W.3d at 593 ("a cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible").

Contrasting Subsection (d) against (m) provides conclusive support. Subsection (d) states that "[f]ollowing submission of the [application], the executive director . . . shall determine *if* the facility, device, or method is used wholly or partly as [pollution control property]." [Emphasis added]. TEX.TAX CODE ANN. § 11.31(d). Subsection (m), states that after receiving an application with a k-list property, the executive director "shall determine *that* the facility, device, or method described in the application is used wholly or partly as [pollution control property]." [Emphasis added]. *Id.* at § 11.31(m). The statute's plain language thus confirms that, while the executive director generally has the discretion to determine "if" property is used as pollution control property and thus if a positive use determination is required, the executive director has no such discretion

when it comes to property on the k-list.

## What does Subsection (m) do?

The TCEQ recognizes, and I agree, that Subsection (m) does at least "two things" when property described in an application is on the k-list. First, it allows an applicant to file an abbreviated application. Second, it requires that the executive director provide an expedited application process. Specifically, Subsection (m) eliminates the (c)(1) requirement to provide the TCEQ with information regarding the environmental benefits of the property described in the application. *See* TEX.TAX CODE ANN. § 11.31(m). Subsection (m) also requires that the executive act on the permissively incomplete application within 30 days of its receipt. *Id.* In addition to the abbreviated application and the expedited process, and unlike the Court finds today, I read Subsection (m) to reinforce the executive director's limited discretion: it limits the executive director's discretion to determine only what proportion or percentage of the property is used as pollution control property. *See id.* Unlike other exemption applications without a k-list property, k-list applications need not include—and the TCEQ need not evaluate—whether the information detailing the anticipated environmental benefits from the installation of the property matter. *See* § 11.31(m). The Legislature considered the environmental benefits anticipated from HRSGs and other k-list property and determined that they are adequate and in satisfaction of Subsection (b). *Id.* at § 11.31(k), (b).

## Will all k-list applications receive an exemption?

The conclusion I reach does not necessitate finding that every application that includes k-list property will be entitled to an exemption there are still as other requirements. Subsection (a), the subsection providing for the tax exemption, defines circumstances when an application is not entitled to an exemption from taxation. It provides that "[a] person is not entitled to an exemption

22

from taxation under this section solely on the basis that the person manufactures or produces a product or provides a service that prevents, monitors, controls, or reduces air, water, or land pollution." TEX.TAX CODE ANN. § 11.31(a). It also does not allow an exemption for "[p]roperty used for residential purposes, or for recreational, park, or scenic[14] uses as defined by Section 23.81, is ineligible for an exemption under this section." *Id*. Additionally, the statute requires that the property be property that the applicant "owns." *Id*. So an applicant leasing the property satisfying the statutory definition under Subsection (b) or leasing a k-list property would be ineligible for the exemption. Additionally, Subsection (m) plainly instructs the TCEQ to review all applications to ensure that property in the application was installed to satisfy a regulatory purpose requirement, determine which proportion of the property functions as pollution control property, and determine the cost of the property described.[15] *Id*. at § 11.31(c)(2)-(3), (m).

Section 11.31 is not the only statute that identifies property the Legislature has classified as pollution control property. The Legislature established an exemption for property used to collect, compress and transport, process, and deliver gas generated by landfills. *See* TEX.TAX CODE ANN. § 11.311(b)(West Supp. 2016). In so doing, it expressly stated that the "[p]roperty described by this section is considered to be property used as a facility, device, or method for the control of air, water, or land pollution." *See id*. at § 11.311(c). Similarly, the Legislature established an exemption for solar and wind-powered energy devices. *Id*. at § 11.27(a)(West 2015). These sections make clear that the Legislature can "predetermine" that specified types of property qualify as pollution control property.

---

[14] I find here that this addresses the majority's misplaced reliance on the TCEQ's "billionaire" hypothetical.

[15] As explained above, the "proportion" language in Subsection (c)(3) applies only to the distinction between the pollution-control function and non-pollution control function (established under Subsection (g) as the production function) of the property. *See* TEX.TAX CODE ANN. § 11.31(c)(3). It does not mean impose a distinction between the regulatory purpose of the property and the non-regulatory purpose of the property. *Id*.

§ 11.31(g-1)

The majority today accepts the TCEQ's contention that (g-1) in Section 11.31 extends the TCEQ discretion to make negative or zero use determinations in applications with k-list property. A plain reading of the subsection does not establish such authority, and I do not read (g-1), in contemplation of Section 11.31 as a whole, as giving the TCEQ such discretion. The subsection eliminated Tier IV applications provided by the 2008 Rules, which had allowed applicants with property on the k-list to propose their own methodology for calculating a use percentage. 2008 Rules § 17.17(d), (e). By its terms, the enactment of (g-1) did not grant the TCEQ any more discretion that it had before the 2010 Rules.

*Mont Belvieu*

The majority also cites a previous decision by the Austin Court of Appeals to support the proposition that the TCEQ may consider the "economic irrationalities" in its use determinations, suggesting that it is an available consideration to find negative use determinations for k-list property. However, I read *Mount Belvieu* as contravening the majority's holding today. *Mont Belvieu*, 382 S.W.3d at 489. First, as explained above, the Texas Supreme Court has noted that when considering the economic realities of a tax statute, courts should not impose entirely new requirements. *Health Care Servs. Corp.*, 401 S.W.3d at 627 n.8. Second, the Austin Court of Appeals' decision in *Mont Belvieu* held that pollution control property that also has a production function "cannot qualify as 100% pollution-control property." *Mont Belvieu*, 382 S.W.3d at 489. The court further explained that dual-function property is, however, entitled to a partial positive use determination commensurate with the "proportion of the property's value that is attributable to a pollution-control feature." *Id.* HRSGs are, at least partly, pollution control property and cannot therefore be 100 percent non-pollution control property. *See* TEX.TAX CODE ANN. §

24

11.31(b), (k).

*Freestone Power*

I find compelling support for my conclusion in a recent decision by the Austin Court of Appeals. *See Freestone Power Generation, LLC v. Texas Comm'n on Envtl. Quality*, No. 03-16-00692-CV, 2017 WL 3044547, at *1 (Tex.App.--Austin July 11, 2017, no pet.h.)(mem. op.). In *Freestone*, the court faced an almost identical issue: whether the TCEQ exceeded its authority under Section 11.31 when it issued negative use determinations for HRSGs. *Id*. at 6. The court held that "while the [executive director] generally has the discretion to determine 'if' property is used for pollution control, he has no such discretion—short of formally removing the property from the K-list—when it comes to K-list property, which by statutory definition is pollution control property." *Id*. at 7 (citing TEX.TAX CODE ANN. § 11.31(d), (k), (*l*), (m)). "Therefore," the court further stated, "although there is no statutory requirement as to what positive use percentage the [executive director] must find, under Section 11.31 construed as a whole, [the executive director] may not find that K-list property has *no* positive use for pollution control." [Emphasis in orig.]. *Id*., (citing *R.R. Com'n of Texas v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011)).

Notably, the applications in *Freestone* were reviewed under the 2008 Rules; here, Brazos Electric's applications were submitted under the 2010 Rules which expressly require, under (g-1), the "equal and uniform" consideration demanded by (g-3) of the statute. Nonetheless, as previously explained, (g-1) merely provided for "uniform[ity]" of methodology for calculating use percentages, but it did not eliminate the legislative finding that k-listed property had already been recognized as having pollution control benefits. 2008 Rules § 17.17(d), (e). Most importantly, Subsection (g-1) did not explicitly give the TCEQ authority to issue negative use determinations

25

for k-listed property.

## CONCLUSION

Per Section 11.31 of the Tax Code, as long as *some* portion of the property included in an application for a tax exemption is used as pollution control property (and the Legislature has mandated the inherent, pollution-control nature of k-listed property), an applicant is entitled to a determination that distinguishes the proportion of the property that is used for pollution control from the proportion of the property that is used to produce goods. TEX.TAX CODE ANN. § 11.31(g)(3). To this end, the statute's words are unambiguous and to find otherwise would be contrary to a plain reading of the text. I would hold that the TCEQ exceeded its authority and abused its discretion by issuing negative use determinations for Brazos Electric's HRSG applications, and I would sustain Brazos Electric's first issue. Because the first issue is dispositive of this appeal, there is no need to reach Brazos Electric's second or third issue. I respectfully dissent.

September 15, 2017

GINA PALAFOX, Justice